**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

**CIVIL NO. 3:06CV293-03-T**
**(3:02CR156-2-T)**

| | | |
|---|---|---|
| **MACY WALKER MCLEAN,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **MEMORANDUM AND** |
| | ) | **O R D E R** |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on Petitioner's motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255 and supporting memorandum[1] filed July 17, 2006; Respondent's answer and motion for summary judgment filed July 11, 2007; Petitioner's opposition to the Government's motion for summary judgment filed August 20, 2007, and accompanying exhibits; Petitioner's memorandum in support of her motion to vacate filed October 6, 2008; and Respondent's amended answer to Petitioner's motion to vacate filed August 14, 2009.

_____

[1] Petitioner also filed a motion to proceed in *forma pauperis*. Because there is no filing fee required for a § 2255 proceeding, this motion will be denied as moot.

## I. FACTUAL AND PROCEDURAL HISTORY

On September 13, 2002, Petitioner and six co-defendants were charged in a 66-count superseding bill of indictment in a wide ranging scheme to defraud investors in the secondary mortgage market by creating and selling bogus mortgage loans. **Superseding Bill of Indictment, filed September 13, 2002.** McLean and retained counsel, Claire Rauscher,[2] proceeded to trial on November 12, 2002. After a nine-day trial, the jury found McLean guilty on all objects of the conspiracy charged in Count One and all remaining substantive counts of the indictment except Counts 33 through 36. **Verdict Sheet, filed November 22, 2002.**

McLean's presentence report calculated her base offense level as 36 and a criminal history category I. Petitioner received a two-level downward departure for her substantial assistance in the prosecution of First Beneficial Mortgage Corporation's ("FBMC") former accountant. ***See* Government's Motion for Downward Departure, filed November 21, 2003.** McLean received an additional two-level downward departure for

_____

[2] Rauscher was retained by McLean during the proceedings before this Court, but was later court appointed to represent her on appeal. **Exhibit 1, Affidavit of Claire J. Rauscher, *attached to* Respondent's Answer to Petitioner's Motion, filed July 11, 2007.**

unusual family circumstances based on her minor children with disabilities, which yielded a total offense level of 32 with a sentencing range of 121 to 152 months.  On November 24, 2003, this Court sentenced the Petitioner to a term of 126 months imprisonment.  **Judgment in a Criminal Case, filed December 9, 2003.**

Petitioner filed a timely notice of appeal on November 25, 2003. Petitioner's appeal was consolidated by the Fourth Circuit Court of Appeals with that of her husband and co-defendant James McLean, and co-defendants Paul and Debbie Zimmerman.  **Fourth Circuit Order, filed January 9, 2004**.

On September 2, 2004, the appellants filed a consolidated brief outlining ten issues, including: sufficiency of the evidence (issue I); the Court's failure to admit certain evidence of McLean's "extensive family responsibilities" (issue II); the Court's "willful blindness" instruction (issue III); the Court's failure to give a "good faith" instruction with respect to the false mortgage note counts (issue IV); the Court's failure to give a "reliance" instruction (issue V); the Court's use of the mandatory Federal Sentencing Guidelines in light of the United States Supreme Court's then recent opinion in *Blakley v. Washington,* 542 U.S. 296 (2004) (issue VI);

and various issues related to the application of the Federal Sentencing Guidelines (issues VII - X).

The appellants' consolidated brief included a common statement of the case as well as their individual statement of facts. Petitioner's statement discussed her role as James McLean's wife, the mother of his six children and her "limited" duties at FBMC. Her attorney highlighted testimony from the trial which showed that Petitioner handled mainly payroll and funded loans, had no decision-making authority at FBMC, and generally played a support role to her husband. Petitioner's attorney also attempted to distinguish Petitioner from her husband, but conceded the evidence at trial established that James McLean did not have Fannie Mae or Ginnie Mae authority to sell loans by "investors" and secured by vacant lots. However, she vigorously argued that the Government failed to show that Macy McLean had any direct knowledge that her husband's activity was illegal. Moreover, counsel argued that this Court erred when it sustained the Government's objection to her cross-examination of James McLean when she attempted to elicit testimony concerning the nature of the McLean's daughters' disabilities.

After hearing oral argument in February 2005, the Fourth Circuit issued its *per curiam* opinion on May 2, 2005, affirming the convictions of all appellants, including Petitioner, but vacated and remanded the cases for resentencing in light of the Supreme Court's decision in *United States v. Booker,* 543 U.S. 220 (2005)*. **United States v. McLean, 131 F. App'x 34, 41 (4th Cir. 2005)**. The Court specifically rejected Petitioner's argument that this Court's "willful blindness" instruction was improper or that the evidence was insufficient to show that she "'knowingly or intentionally attempt[ed] to defraud Fannie Mae, Ginnie Mae or BB&T;' that she did not 'knowingly make false entries, [or] false statements;' or that she did not 'knowingly launder money' or 'aid or abet others in any criminal activity.'" ***Id.* at 39 (quoting Appellants' Brief at 29).** With respect to Petitioner's sufficiency of the evidence arguments, the Fourth Circuit observed:

> Macy took the position that she had no real input into how FBMC was run, that her husband exercised substantial control over her employment activities, and that she merely followed his directives. The evidence, however, showed that Macy was an officer of FBMC; that she was in charge of payroll and loan funding; that she handled questions from FBMC's document custodian for the Ginnie Mae mortgage notes; that she created the bogus mortgage notes; that she told "investors" that they would not have to pay money on the notes they signed; that she endorsed the notes over to Fannie Mae; and that she offered a former FBMC employee $5,000 to use her son's name on a mortgage loan.

*Id.*  The Fourth Circuit also sustained this Court's ruling to exclude details of the McLeans' children's disabilities and found that there was "ample evidence for a reasonable trier of fact to have found defendants guilty beyond a reasonable doubt on each count of conviction."  *Id.* **at 40-41***.*

Petitioner appeared with the same trial counsel for resentencing on July 27, 2005.  Prior to the hearing, counsel filed a detailed sentencing memorandum on Petitioner's behalf, analyzing each of the § 3553(a) factors in terms of this case in order to justify her requested variance from the Guidelines.  **Sentencing Memorandum, filed July 26, 2005**.  The memorandum included affidavits in support of Petitioner as well as numerous certificates demonstrating her efforts to improve herself while in prison.

Counsel's arguments on behalf of Petitioner persuaded the Court to vary from the Sentencing Guidelines and impose a sentence of 96 months imprisonment, instead of the prior sentence of 126 months – 30 months less than her previous sentence and a 25-month downward variance from the lowest applicable Guidelines range.  **Amended Judgment in a Criminal Case, filed August 5, 2005**.

Petitioner did not appeal her amended sentence. She timely filed her § 2255 motion herein on July 17, 2006, and moved to amend the motion with an "Amendment to Ground No. 2" and an affidavit from James McLean. The Respondent did not oppose Petitioner's motion to amend. Petitioner lists 23 "grounds" on which her convictions and sentences should be vacated. These grounds allege defects in the indictment ("constructive amendment," duplicity and multiplicity), insufficiency of the evidence, prosecutorial misconduct and ineffective assistance of counsel. However, all grounds except one – ground # 22 alleging prosecutorial misconduct, are couched in terms of ineffective assistance of counsel. Petitioner's ground # 23 alleging ineffective assistance of counsel, re-alleges the prior 22 grounds in addition to other perceived errors by counsel. On October 6, 2008, Petitioner filed a memorandum in support of her motion to vacate in which she adds the additional claim that her counsel was ineffective for failing to argue that she was legally innocent of the money laundering offenses in light of the Supreme Court decision in *United States v. Santos*, 128 S. Ct. 2020 (2008).

## II. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(c), a Court may grant summary judgment when the pleadings and other relevant documents reveal that "there is not genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." **See, e.g. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir. 1990).**

A genuine issues exists only if "the evidence is such that a reasonable jury could return a verdict for the on-moving party." **Anderson, 477 U.S. at 248.** However, the party opposing summary judgment may not rest upon mere allegations or denials and, in any event, a "mere scintilla of evidence" is insufficient to overcome summary judgment." **Id. at 249-50.**

## III. ANALYSIS

Petitioner alleges a number of claims against her attorney which she argues deprived her of her constitutional right to the effective assistance of

counsel.[3]  **Motion to Vacate, at 41 - 47**.  These errors can be categorized as follows:

A. Failure to object at trial and on direct appeal to the "constructive amendment" of the indictment (ground # 23, ¶ 1; also alleged in ground #'s 1-2, 5-10);

B. Failure to object at trial and on direct appeal to defects in the indictment (ground #23, ¶ 2; also alleged as "constructive amendments of the indictment" in ground #'s 1,5, 8-10);

C. Failure to raise at trial and on direct appeal that certain counts in the indictment were multiplicious (ground #23, ¶ 3; also alleged in ground #'s 11 and 12);

D. Failure to object at trial and on direct appeal that counts 11-21, 22-32, 33-36, and 37-52 were duplicitous (ground #23, ¶ 16; also alleged in ground #'s 3-4, 19);

E. Complaints concerning trial presentation, strategy and argument, including:

---

[3] Apparently recognizing that 22 of her 23 grounds to vacate her conviction would be barred because they were not raised or could have been raised on direct appeal, Petitioner couches them as ineffective assistance of counsel claims.  Therefore, this Court will limit its analysis on Petitioner's claims as ineffective assistance of counsel claims.

1. Failure to present FBMC's HUD application and approval to issue Title I manufactured home loan guarantees (ground #23, ¶ 5);

2. Failure to present a business plan and loan request that FBMC submitted to BB&T (ground 23, ¶ 6);

3. Failure to impeach former FBMC employee Sharon Abrams with evidence that she had access to HUD manuals, regulations and forms *via* the Internet (ground #23, ¶ 7);

4. Failure to impeach former FBMC underwriter and co-defendant Richiedean Gess with the statements of former FBMC employee Keith Jeffries and other FBMC underwriters who had approved FBMC's "construction loan program" and to call Keith Jeffries as a defense witness at trial (ground #23, ¶¶ 8 & 18);

5. Failure to "rebut" Ginnie Mae employee Sandra Dixon's testimony with an "FBMC" annual approval recertification form (ground #23, ¶ 9);

6. Failure to impeach Sandra Dixon with the out of court statement of Ginnie Mae employee Mike Garcia that manufactured housing loans could be pooled "so long as those homes are stick built and [ ] permanent" and to call Mike Garcia as a defense witness at trial (ground # 23, ¶¶ 10 & 13);

7. Failure to "state" facts at trial that would show that Petitioner acted in good faith and that the Government failed to prove she acted with specific intent or willful blindness of the facts (ground # 23, ¶ 12);

8. Failure to impeach Eric Brown's testimony concerning his dealings with co-defendants James McLean and Debbie Zimmerman (ground # 23, ¶ 14);

9. Failure to raise prosecutorial misconduct at trial - *i.e.*, that the prosecutors knew "a lot of government witnesses testified falsely" and failed to correct them (ground #23, ¶ 17); and

10. Failure to request "an evidence hearing" in order to have the testimony of Eric Brown and Woodrow Moore "suppressed" (ground #23, ¶ 19).

F. Failure to argue that Petitioner was legally innocent in light of *United States v. Santos*, 128 S. Ct. 2020 (2008);

G. Complaints concerning appellate presentation, strategy and argument, including:

1. Failure to raise sufficiency of the evidence and Petitioner's lack of criminal knowledge and specific intent (ground # 23, ¶ 4; also alleged in ground #'s 13-21); and

2. Failure to correct or "rebut" certain "misleading" statements in the Government's brief (ground #23, ¶¶ 11& 15).

When alleging a claim of ineffective assistance of counsel, a petitioner must show that counsel's performance was constitutionally deficient to the extent it fell below an objective standard of reasonableness, and that she was prejudiced thereby. ***Strickland v. Washington*, 466 U.S. 668, 687-91 (1984)**. In making this determination, there is a strong presumption that counsel's conduct was within the wide range of reasonable professional assistance. ***Id.* at 689**; ***see also Fields v. Attorney Gen'l. of Md.*, 956 F.2d 1290, 1297-99 (4th Cir. 1985)**; ***Hutchins v. Garrison*, 724 F.2d 1425, 1430-31 (4th Cir. 1983)**; ***Marzullo v. Maryland*, 561 F.2d 540 (4th Cir. 1977)**. It should be noted that "effective representation is not synonymous with errorless representation," and "the Constitution entitles a criminal defendant to a fair trial, not a perfect one." ***Springer v. Collins,* 586 F.2d 329, 332 (4th Cir. 1978)**; ***Delaware v. Van Arsdall,* 475 U.S. 673, 681 (1986)*.**

To demonstrate prejudice, Petitioner must show a probability that the alleged errors worked to her "'*actual* and substantial disadvantage, infecting [her] trial with error of constitutional dimensions.'" ***Murray v.**

**Carrier, 477 U.S. 478, 494 (1986) (quoting United States v. Frady, 456 U.S. 152, 170 (9182)).** Under these circumstances, Petitioner "bears the burden of proving Strickland prejudice." **Fields, 956 F.2d at 1297 (citing Hutchins, 724 F.2d at 1430-31).** Therefore, if Petitioner fails to meet this burden, a "reviewing court need not consider the performance prong." **Id. at 1290 (citing Strickland, 466 U.S. at 697)**.

## A. Constructive Amendment

Petitioner's first ineffective assistance of counsel claim alleges her attorney failed to object at trial and pursue on appeal the "constructive amendment" to the superseding indictment. In her affidavit, Petitioner's counsel states that she did not raise these objections because they are not supported by law. **Exhibit 1, Affidavit of Claire J. Rauscher, *attached to* Respondent's Answer, filed July 11, 2007, ¶ 2.**

"Constructive amendment" occurs when the government, through its presentation of evidence and/or arguments, or the court, through its instructions to the jury, broadens the bases for conviction beyond those charged in the indictment. **United States v. Randall, 171 F.3d 195, 203 (4th Cir. 1999)**. "A constructive amendment is a fatal variance because the

indictment is altered 'to change the elements of the offense charged, such that the defendant is actually convicted of a crime other than that charged in the indictment.'" *Id.* **(citing *United States v. Schnabel,* 939 F.2d 197, 203 (4th Cir. 1991)).** However, not all differences between an indictment and proof at trial rise to the level of a "fatal variance" or constructive amendment. *Id.* When different evidence is presented at trial than specified in the indictment, but such evidence does not otherwise alter the crime charged in the indictment, a mere variance occurs. *Id.* A mere variance does not violate a defendant's Constitutional rights unless it prejudices the defendant, either hindering the preparation of her defense or by surprising her at trial or exposing her to the risk of a second prosecution for the same offense. *Id.*

Petitioner contends that this Court impermissibly "broadened" the offense charged in the indictment through instructions on "aiding and abetting," "knowingly and intentionally," and "willful blindness" and that the Government presented evidence beyond that noticed in the indictment. Petitioner contends that the Court amended Counts 37 through 52 charging that she made and passed false mortgage notes when it instructed the jury on aiding and abetting. Petitioner claims that this

expanded the indictment because aiding and abetting did not appear in these counts.

First, a review of the superseding indictment reveals that Counts 37 through 52 were preceded and followed by specific citation to 18 U.S.C. § 2, the aiding and abetting statute. **Superseding Indictment, at 21-23.** Therefore, Petitioner cannot claim that she was surprised or prejudiced by the Court's instruction on aiding and abetting. Next, aiding and abetting is implied in every federal indictment of a substantive offense. ***See United States v. Armstrong*, 909 F.2d 1238, 1241 (9th Cir. 1990).** Indeed, "'in keeping with the provisions of [18 U.S.C.] § 2, it has long been held that an indictment need not specifically charge 'aiding and abetting' or 'causing' the commission of an offense against the United States in order to support a jury verdict based on the finding of either." ***Id*. (quoting *United States v. Lester*, 363 F.2d 68, 72 (6th Cir. 1966))**.

Next, the Court's instructions on "knowing," "willful blindness" and "specific intent" did not "broaden" the charged offenses just because those words were not alleged in the indictment. Indeed, each of the offenses that Petitioner now claims were constructively amended tracked the language of the statute charged. Counts 37 through 52 used the words "with intent

that false mortgage notes be offered to, or accepted by, HUD for insurance" and they were made, passed or uttered by the defendants "knowing that they were materially false." **Superseding Indictment, *supra*.** The Court's instructions on these offenses necessarily included the words "knowing," "intentional," and "material."[4] Similarly, the law does not require that the words "willful blindness" appear in the charged offenses before the Court may instruct on how this legal doctrine might apply to the facts of this case. Indeed, in this case, the Fourth Circuit specifically held that the willful blindness instruction was proper. ***McLean,* 131 F. App'x at 38-39.**

Petitioner has not established that counsel was deficient in failing to raise a constructive amendment claim with respect to the Court's instructions at trial or on appeal. Therefore, this claim of ineffective assistance of counsel must fail.

Petitioner also argues that the Government's evidence broadened the charged offenses. Petitioner appears to argue that any evidence that deviates from the specific allegations in the charged offense is not

---

[4] Petitioner makes similar claims with respect to Counts 2-21 (alleging wire fraud); 52-53 (alleging bank fraud); and 55-66 (alleging money laundering).

permitted.  Petitioner relies on *Stirone v. United States,* 361 U.S. 212, 218-219 (1960), in support of her claim.  In *Stirone*, the Government charged the defendant with violating the Hobbs Act by misusing his position as a labor union official to obstruct interstate commerce, specifically the movement of sand used in mixing concrete.  ***Id*. at 214.**  At trial, the Government also proved that the defendant's activities affected interstate commerce because the concrete was used to construct buildings in which steel was manufactured for interstate shipment.  ***Id***.  The district court instructed the jury that they could find the defendant guilty if they found either basis for the interstate element – *i.e.*, the interstate movement of sand or the use of concrete to build steel plants.  ***Id***.  In reversing the defendants convictions, the Supreme Court held that the indictment could not "fairly be read" as charging interference with interstate commerce through the movement of steel.  ***Id. at 217.***

Petitioner's case is distinguishable from the *Stirone*.  Here, the superseding indictment charged a broad scheme to defraud Fannie Mae, Ginnie Mae and BB&T, as well as investors in the secondary mortgage market.  In Counts Two through Ten, the indictment charged Petitioner and her co-defendants with devising a scheme to defraud Fannie Mae which

was executed through the use of interstate wire transmissions, that is, the transfer of funds from Fannie Mae to FBMC's bank account. **Superseding Indictment, ¶¶ 50-52.** However, the introductory paragraphs of the superseding indictment as well as Count One (overarching conspiracy allegation) are specifically incorporated into Counts Two through Ten by reference. *Id.* **¶ 50**. Paragraphs 12 through 14 and 22 of Count One allege the defendants made and sold 31 false mortgage notes to Fannie Mae. Contrary to Petitioner's argument in ground #2, the indictment did allege that she and her co-defendants made false mortgage notes and assignments. Unlike *Stirone*, the Government's evidence at this trial did not introduce a new theory with respect to an element of the charged offense. Instead, the evidence offered at trial tracked the indictment and proved Petitioner's guilt on the charged offense beyond a reasonable doubt.[5]  ***See United States v. Ward,* 486 F.3d 1212, 1228 (11th Cir. 2007) (indictment alleging mail fraud and wire fraud counts was not**

---

[5] Petitioner raises similar claims with respect to Counts 22 through 32 (False statements) and 55 through 66 (money laundering). A fair reading of the indictment with respect to these counts shows that Petitioner's constructive amendment arguments are also without merit.

**constructively amended by incorporation of a charged conspiracy by reference.).**

Petitioner also alleges that the Court's admission of evidence of Ginnie Mae's loss was improper since loss is not an element of 18 U.S.C. § 1010, and relies on *United States v. Farrington,* 389 F.2d 357 (6th Cir. 1968), to support this argument.

In the instant case, the Government did not introduce evidence of how much money Ginnie Mae lost due to FBMC's fraud. Instead, the Government offered evidence of how much money Ginnie Mae reimbursed Market Street – the loan servicer who took over FBMC's loans. The trial testimony concerned loans for which Market Street could not collect past due payments or find collateral to foreclose. **Trial Transcript, Vol. IV, filed February 18, 2004, at 1084-91**. This evidence was relevant to rebut the defendants' claim that they did not knowingly commit fraud, but instead made manufactured home loans which were authorized by Ginnie Mae. The testimony was also offered to prove that the loans affected HUD. Market Street's representative testified that it could not collect on most FBMC loans because it could not locate many of the borrowers named on the loans issued by FBMC and found "bad addresses" when they tried to

foreclose on the collateral listed on FBMC loan documents. *Id.* **at 1091-93**.

Moreover, Market Street's testimony that Ginnie Mae paid out over $23

million by the time of trial was relevant to the charged conspiracy and

money laundering counts.

In *Farrington*, the defendant was charged only with presenting HUD

with false completion certificates for home repairs, for which loss amount

was not relevant. Therefore, *Farrington* is distinguishable from the instant

case and does not support Petitioner's claim that her counsel was

ineffective for not objecting to the Court allowing the alleged improper

admission of evidence regarding loss. Moreover, Petitioner has not

established that her counsel was deficient for failing to object to the

admission of evidence regarding loss as is required under *Strickland*.

Finally, in her amendment to ground # 2, Petitioner contends that the

testimony from Willie Simpson, an FBMC employee whose duties included

monitoring FBMC employees and visitors through video and audio

surveillance, impermissibly broadened the indictment because it suggested

an illegal wire tap in violation of 18 U.S.C. § 2511.

This argument is totally without merit. First, there was no allegation

that the surveillance system was illegal since it was company policy and

was known to the employees.  Second, the surveillance system was intrinsic to the offenses in that the McLeans recorded themselves and their employees in the act of committing offenses alleged in the indictment.

Petitioner has not established that her counsel was deficient for failing to object to the evidence presented at trial which she claims improperly broadened the charged offenses.  Petitioner has not established either prong of the *Strickland* test and, therefore, her claim of ineffective assistance of counsel must fail.

## B. Defective Indictment

Petitioner contends that her counsel was ineffective for failing to object at trial and raise on direct appeal that the indictment was defective. Specifically, Petitioner contends that Counts 2 through 21, which allege wire fraud against Fannie Mae and Ginnie Mae and aiding and abetting in violation of 18 U.S.C. §§ 1343 and 2, are defective for failing to allege that the "representations, statements or omission in the wire communication were material to the scheme or artifice [to defraud]."  Petitioner contends that Counts 37 through 52, alleging the making and passing of counterfeit mortgage notes in violation of 18 U.S.C. § 1010, are defective because

they fail to include the words "aiding and abetting" and "knowingly and intentionally."  Petitioner contends that Counts 53 through 54, the bank fraud charges, are defective for failing to allege "material;" and that Counts 55 through 66, the money laundering charges, are defective for failing to allege "knowingly and intentionally."

It seems Petitioner believes that the quoted words above must be stated in the indictment because the Court used them in its charge to the jury.  Petitioner misunderstands the law.

An indictment must contain the elements of the offense charged and fairly inform the defendant of the charge against her and must enable her to an acquittal or conviction in bar of future prosecutions for the same offenses.  ***Hamling v. United States,*** **418 U.S. 87, 117 (1974).**  It is generally sufficient that an indictment set forth the offense in the words of the statute itself as long as those words are unambiguous and set forth all of the elements of the offense charged.  ***Id***.

In this case, each of the Court's instructions challenged by Petitioner tracks the language of the statute.  Indeed, Counts 2 through 21, the wire fraud counts, allege the defendants "did knowingly and willfully devise and intend to devise a scheme and artifice to defraud" and to obtain money and

property by means of "material false and fraudulent pretenses."  Counts 37

through 52 allege the named defendants made and passed counterfeit

mortgage notes "knowing them to be false" and "counterfeited."  Counts 53

and 54, the bank fraud counts, allege that the McLeans and Gess "did

knowingly execute and attempt to execute a scheme and artifice to defraud

BB&T."[6]  Finally, Counts 55 through 66, the money laundering counts,

state that McLean and her husband James, aided and abetted each other,

"knowingly" conducted or "willfully" caused another to conduct certain

financial transactions when they "knew" said transactions involved the

proceeds of specified unlawful activities, intending that the transactions

would promote the mortgage fraud scheme described throughout the

introductory paragraphs and Count One of the indictment.  **Superseding**

---

[6] With respect to Counts 53 and 54, the Court properly instructed the jury that the misrepresentations to BB&T must be "material" even though the statute does not include that word.  ***See United States v. Neder*, 527 U.S.1, 20 (1999) (holding that materiality is an element of a scheme or artifice to defraud under the mail, wire and bank fraud statutes).**  In *Neder*, the Supreme Court found that under the common law, a conviction for "fraud" required proof of materiality.  However, just as the Supreme Court has held that the words "obscenity" and "attempt" do not require further explanation in an indictment, neither does "fraud" require the allegation of materiality to satisfy constitutional requirements.  ***See United States v. Wicks,* 187 F.3d 426, 427 (4th Cir. 1999); *Cf. Hamling,* 418 U.S. at 117; *United States v. Resendiz-Pounce,* 549 U.S. 102, 104 (2007).**

**Indictment,** *supra*.  While the Court's instructions may have included different words to explain the required scienter to the jury, it does not mean the indictment was defective.  The indictment in this case passes constitutional muster in that it was sufficient to put the defendants on notice of the offenses charged and to bar any future prosecutions from the same crimes.  Therefore, counsel was not deficient for failing to raise a defective indictment claim at trial or on appeal.  Moreover, even if this Court were to assume the indictment was in some manner deficient, which it does not, Petitioner has not established prejudice as each count of the indictment contained a reference to the statute charged in its caption and in the body of the charge itself.  ***See United States v. Roberts,* 296 F.2d 198, 200 (4ᵗʰ Cir. 1961)**.

Petitioner has not established either prong of the *Strickland* test, therefore, her claim that her counsel was ineffective for failing to raise a claim that the indictment was defective must fail.

**C. Multiplicious Indictment**

Petitioner contends counsel was ineffective for failing to object to Counts 9 and 10, 37 through 39, 40 and 41, 43 and 44, 46 and 47, and 48

through 52 because they are multiplicious. Petitioner contends that Counts 9 and 10 are multiplicious because the loans secured by the two addresses in those Counts were sold to Fannie Mae under the same contract. She claims that Counts 37 through 39, 40 and 41, 43 and 44, 46 and 47, and 48 through 52 are multiplicious because the counterfeit mortgage notes alleged separately in each of these counts were sold to Ginnie Mae investors in the same pools.

Multiplicity is defined as "charging a single offense in more than one count in an indictment." ***United States v. Lemons***, **941 F.2d 309, 317 (5th Cir. 1991)**. In *Lemons*, the defendant claimed that a series of transactions charged under separate counts of bank fraud in violation of 18 U.S.C. § 1344 constituted a single scheme to defraud. The court agreed with the defendant because the bank fraud statute, unlike the mail and wire fraud statutes, punishes "execution" of a scheme to defraud, whereas the mail and wire fraud statutes expressly punishes separate acts in execution of a scheme to defraud. *Id*. **at 318**. Thus, each separate use of wire communications constitutes a separate offense even if the defendant is engaged in a single scheme to defraud. ***United States v. Butler*, 704 F. Supp 1338, 1343 (E.D. Va. 1989) (citing *United States v. Muni*, 668 F.2d**

**87 (2d Cir. 1981); *United States v. Calvert*, 523 F.2d 895 (8th Cir. 1975),**

***aff'd*, 90-5 F.2d 1532 (4th Cir. 1990); *United States v. Locklear*, 829 F.2d**

**1341, 1318-19 (4th Cir. 1987)).**

In this instant case, Count 9, alleging a violation of 18 U.S.C. § 1343,

charged that the defendants caused Fannie Mae to wire a payment to

FBMC on October 1, 1998, for purposes of a fraudulent loan purportedly

secured by a residence located at 9101 Crosstimbers.  Count 10 charged

that the defendants caused a separate wire transfer on October 5, 1998,

for the purchase of a different fraudulent loan purportedly secured by a

residence at 9001 Penstemmons.  These separate wire transactions were

supported at trial by copies of the bank's records.  Whether or not the two

fraudulent loans were sold to Fannie Mae in a single transaction, as

Petitioner claims, is not relevant, so long as she and/or her co-defendants

caused separate wire transactions for each loan.  ***See Butler*, 704 F. Supp**

**at 1344**.

Counts 37 through 52 charge that the defendants made, passed and

uttered different counterfeit mortgage notes.  Title 18 U.S.C. § 1010

punishes "whoever . . . makes, passes [or] utters . . . any statement,

knowing the same to be false . . .or counterfeits any instrument . . . or

utters, publishes, or passes as true any instrument, paper, or documents, knowing it to have been . . . counterfeited." Each of Counts 37 through 52 then specifically describes different promissory notes that were "made, passed or uttered" on different occasions. Like the wire fraud statute, it is clear from the statute that Congress intended that the making of each false or counterfeit document would constitute a separate violation of the law. ***See Bins v. United States*, 331 F.2d 390, 392 (5th Cir. 1964) ("The essence of a violation of [§ 1010] is the uttering and publishing of false documents with intent to influence [HUD].").**[7]

At trial, the Government established that Petitioner was the person who directed her assistant, Shandra Wright, to type the fraudulent notes from lists of properties that she and the Zimmermans provided. **Trial Transcript, Vol. II, filed February 18, 2004, at 497.** The notes were counterfeit because the names on the loans were not the names of true borrowers and the properties listed were not residences that would be

---

[7] Petitioner relies on this case in support of her claim that Counts 37 through 52 are duplicitous. The Court notes that, unlike the facts in *Bins* where more than one false statement was alleged in a single count, in this case, Counts 37 through 52 allege only one false mortgage note each.

occupied by the named borrowers.  Petitioner "passed" the notes by forwarding them to the document custodian at BB&T.

There is no legal or factual basis to support Petitioner's claim that any of the counts in the indictment were multiplicious.  Therefore, her claim that her counsel was ineffective for failing to raise this issue at trial and on appeal must fail.


## D. Duplicitous Indictment

Next, Petitioner contends counsel was ineffective for failing to challenge various counts in the indictment as duplicitous.  Petitioner's duplicity claims appear to fall into two categories: (1) single counts that allege the submission of more than one HUD form (counts 11-21 and 22-32), and (2) single counts that allege more than one means of committing the same offense (counts 37-52).

"Duplicity is the 'joining of two or more offenses in a single count.'" **United States v. Toliver, 972 F. Supp 1030, 1039 (W.D. Va. 1997) (quoting United States v. Marshall, 75 F.3d 1097, 1111 (7th Cir. 1996)).** Where a statute provides more than one means of committing the same offense, the policy against duplicity does not prohibit the Government from

charging more than one of those means in the conjunctive, in one count. ***United States v. Griffin*, 502 U.S. 46, 50-51 (1991); s*ee also*, Fed. R. Crim. P. 7(c) (a single count may allege that a defendant committed an offense by one or more means).** Further, the policy against duplicity does not prevent an indictment from alleging more than one act in a single count if the acts are part of a continuous course of conduct. ***See United States v. Smith*, 373 F.3d 561, 563-64 (4th Cir. 2004).**

Counts 11 through 21 and 22 through 32 each allege an offense with respect to different mortgage pools. Because both HUD forms 11705 and 11706 are required to issue a single Ginnie Mae certificate and corresponding pool, Counts 11 through 21 and 22 through 32 allege a continuous course of conduct and are not duplicitous. *Id.* The trial testimony confirmed that Ginnie Mae's representative, Chase Manhattan Bank, must receive both forms before it will allow an issuer such as FBMC to issue a Ginnie Mae mortgage-backed certificate and collect the investors' funds. *See*, **Theodore Foster Testimony, Trial Transcript, Vol., filed February 18, 2004, at 209-17; Wade Gayle  Testimony, Trial Transcript, Vol. III, at 752-56.** It is simply not relevant when or how these forms were submitted to Ginnie Mae since both were required before

FBMC could receive funds for the fraudulent mortgages it pooled.  Further, there was no possibility of juror confusion as each count applied to only one mortgage pool.  None of the mortgage pools in Counts 11 through 21 and 22 through 33 could have been issued without both HUD forms.  Therefore, there was no possibility that she could have been convicted or acquitted on one form, but not the other.

Next, Counts 37 through 52 allege the making and passing of false statements and counterfeit mortgage notes to HUD in violation of 18 U.S.C. § 1010.  Section 1010 of Title 18 is comprised of several operative clauses in the disjunctive.  ***See United States v. Jenkins*, 785 F.2d 1387, 1391 (9th Cir. 1986).**  It is a regular and permitted practice for prosecutors to charge conjunctively, in one count, the various means of committing a statutory offense, which means are listed disjunctively.  ***Griffin v. United States*, 502 U.S. 46, 51 (1991)**.  Each of Counts 37 through 52 allege three different ways in which the defendants violated § 1010 by making, passing or uttering a separate mortgage note.  The three different means track the language of the statute and are alleged in the indictment in the conjunctive.  The test for determining whether a count alleges different means of violating the same statute or several offenses is to examine

whether identical evidence will support each of the different means.  **Bins, 331 F.2d at 392**.  In *Bins*, the indictment charged in a single count that the defendant violated § 1010 by making false statements in three different documents, dated on different days.  The court found these counts to be duplicitous because they obviously require proof of different facts – *i.e.*, that different forms were submitted on different dates.  However, the three different means of violating § 1010 alleged in the instant case require proof of the same facts – *i.e.*, that the single mortgage note described in each of Counts 37 through 52 was false when it was made, passed, uttered or counterfeited on a single date.

There is no legal or factual basis to support Petitioner's claim that any of the counts in the indictment were duplicitous.  Therefore, Petitioner cannot satisfy either prong of the *Strickland* test.  Petitioner's claim that her counsel was ineffective for failing to raise this issue at trial and on appeal must fail.

## E. Ineffective Assistance of Counsel Claims Regarding Trial Strategy

Petitioner asserts a litany of ineffective assistance of counsel claims regarding counsel's trial strategy.  These claims amount to nothing more

than second-guessing a trial strategy Petitioner approved.  Indeed, in her affidavit, counsel states in response to the allegations in paragraphs 11 and 12 of Ground 23 that "all arguments made at trial comported with the trial strategy and were discussed with Mrs. McLean."  **Rauscher Affidavit, ¶ 5**.  "A decision consistent with a reasonable trial strategy cannot support a claim of ineffective assistance of counsel."  ***Strickland*, 466 U.S. at 689**. Petitioner's trial strategy was to convince the jury that despite her position as an officer of FBMC, "she had no real input into how FBMC was run, that her husband exercised substantial control over her employment activities, and that she merely followed his directives."  ***McLean*, 131 F. App'x at 39**. As Rauscher's affidavit shows, it was not part of the strategy to introduce documents such as FBMC's annual recertification forms and to call witnesses such as Keith Jeffries or Mike Garcia.  **See Rauscher Affidavit, ¶¶ 3, 4, 6**.  Such would have only highlighted Petitioner's position in the company and undermined her purported "reliance" on her husband's interpretation of Fannie Mae and Ginnie Mae rules and policies.

In evaluating Petitioner's post-trial grievances, it is important to put them into context with the rest of the evidence admitted at trial.  Although Petitioner chose not to testify, her husband did testify and raised many of

the points she now contends were omitted through her counsel's alleged ineffective representation. In addition, James McLean admitted and/or testified about many of the documents and witnesses Petitioner claims her counsel was negligent in admitting. On most of these points, James McLean reinforced Rauscher's argument that his wife was not in a position to know about the documents or testimony she now claims were critical to her defense.

First, Petitioner contends that her counsel failed to present FBMC's HUD application and approval to issue Title I manufactured home loan guarantees. James McLean stated on direct examination that he submitted a Title I application to Ginnie Mae that allowed "me to do manufactured housing, modular homes, mobile homes, home only and homes without land." **Trial Transcript, Vol. V, at 1221.** However, he also admitted he did not have a copy of the application. *Id.* **at 1305-06.** Further, Ginnie Mae account executive Sandra Dixon testified on rebuttal that she had examined FBMC's issuer file and there was no such application in the file. **Trial Transcript, Vol. VI, at 1642.** Petitioner's counsel cannot be deficient for failing to introduce a document that did not

exist. Petitioner has not established that her attorney's performance was deficient. Therefore, this claim is dismissed.

Next, Petitioner contends that her counsel was ineffective for failing to present the business plan and loan requests that FBMC submitted to BB&T. A review of the trial transcript reveals that former loan officer, John P. Ellis, testified at trial that at one time James McLean "was looking for a line [of credit] to basically fund closings for mobile homes, modular homes that were not affixed to property," but that BB&T did not agree to fund such closings. **Trial Transcript, Vol. IV, at 904**. On cross-examination by Petitioner's counsel, Ellis testified that he only had discussions with James McLean regarding FBMC's line of credit. *Id.* **at 910-11**. On cross-examination by Petitioner's counsel, James McLean stated that it was his decision to make his wife a signatory on FBMC's bank accounts and that she wrote checks and sent wires at his direction. **Trial Transcript, Vol. V, at 1339-40**. Therefore, it is clear that the fact that BB&T had some discussions with FBMC about a construction line of credit was introduced at trial. Counsel was not deficient for failing to introduce a business plan or loan requests because it runs counter to Petitioner's trial strategy that "she had no real input into how FBMC was run, that her husband exercised

control over her employment activities, and that she merely followed his directives." *McLean*, **131 F. App'x at 39**.

Petitioner also alleges that her counsel was ineffective for failing to impeach former FBMC employee Sharon Abrams with evidence that she had access to HUD manuals, regulations and forms *via* the Internet. This claim is without merit; James McLean testified in his direct examination that all FBMC employees had ready access to Fannie Mae and Ginnie Mae manuals *via* the internet at their desks and that such materials were available "on websites offered to the public." **Trial Transcript, Vol. V, at 1237**. Further, Abrams testified that she reviewed at least one mortgage loan source at FBMC - the Federal Housing Administration (FHA) - whose materials warned "straw borrowers schemes" are illegal. **Trial Transcript, Vol. II, at 397.** Therefore, Petitioner has not established deficiency or prejudice for her counsel's failure to impeach Sharon Abrams.

Next, Petitioner contends that her counsel was ineffective for failing to impeach former FBMC underwriter and co-defendant Richiedean Gess with the statements of former FBMC employee Keith Jeffries and other FBMC underwriters who had approved FBMC's "construction loan program" and to call Keith Jeffries as a defense witness at trial. However,

once again, Petitioner cannot establish any prejudice.  The record reveals

that on cross-examination by the Government, James McLean – who was

himself an FHA certified underwriter – testified he had consulted

Richiedean Guess about FBMC's "investor program" initially when the

loans were sold to Fannie Mae, but not when they were pooled as Ginnie

Mae certificates.  **Trial Transcript, Vol. V, at 1322**.  According to his

interview with HUD agent John Gervino, Keith Jeffries left FBMC in 1996

and was not rehired until May 2000, well after defendants began selling

their bogus loans in 1998.  ***See* Exhibit 21, December 10, 2000,**

**Memorandum of Interview, *attached to* Respondent's Answer.**  James

McLean further testified that two other FBMC employees – Melissa Lawler

and Sharon Abrams – did not become certified underwriters until 1999.

**Trial Transcript, Vol. V, *supra.***  Finally, trial counsel knew from the

memorandum of Keith Jeffries' interview, provided to her in discovery, that

if she called Jeffries to testify, he would also say that "Macy McLean . . .

controlled the funding of FBMC and she would not permit anyone else to

control the funding of FBMC."  **Exhibit 21, *supra.***  Therefore, Jeffries'

testimony would not have advanced but would have served as a detriment

to Petitioner's trial strategy.  Petitioner has not established either prong of *Strickland* and her claim of ineffective assistance of counsel must fail.

Petitioner next contends that her counsel was ineffective for failing to rebut the testimony of Ginnie Mae employee Sandra Dixon with an FBMC annual approval recertification form.  Once again, a review of the record reveals that Petitioner suffered no prejudice from her counsel's alleged failure.  Indeed, Sandra Dixon, a Ginnie Mae account executive, testified on rebuttal for the Government that the "mobile" and "manufactured housing" blocks on FBMC's application to become a Ginnie Mae issuer were not checked, she never told James McLean that it was permissible to pool manufactured home loans, and that Ginnie Mae last accepted such loans in the mid-1980's.  **Trial Transcript, Vol. VI, at 1641-43.**  On redirect, the Government showed Dixon FBMC's annual verification reports for 1997 and 1998, which had previously been admitted into evidence as James McLean's exhibits 1 and 2.  ***Id.* at 1645**.  Dixon testified these were not Ginnie Mae forms.  *Id.*  It is clear that Petitioner's counsel had nothing to gain from further cross-examination of Dixon.  Petitioner has not established deficiency or prejudice as is required by *Strickland*.

Next, Petitioner contends that her counsel was ineffective for failing to impeach Sandra Dixon with the out-of-court statement of Ginnie Mae employee Mike Garcia that manufactured housing loans could be pooled "so long as those homes are stick built and [ ] permanent" and to call Mike Garcia as a defense witness at trial. Here, once again, Petitioner cannot establish either prong of the *Strickland* test. Mike Garcia, a Ginnie Mae account executive, told FBI agents in a telephonic interview that he recalled being asked by other Ginnie Mae employees, including Ingrid Ripley, about the appropriateness of placing manufactured housing loans into single family mortgage pools. Garcia told the FBI agents that such homes could be placed in a Ginnie Mae pool only if they were "stick-built and are permanent." Ingrid Ripley testified on rebuttal that her notes reflect a call from James McLean on May 11, 2000, in which he asked a similar question about manufactured housing loans. *Id.* **at 1647**. Ripley testified she told James McLean that the loans would have to be approved as FHA Title I for at least two years or, if pooled as FHA Title II loans – which are single family residences – the property had to be deeded with the structure and land. *Id*. **at 1648.** Since Ripley testified to essentially the

same information from Garcia, the failure to use the statements of Garcia did not prejudice Petitioner.

Petitioner next argues that her counsel was ineffective for failure to state facts at trial that would show Petitioner acted in good faith and that the Government failed to prove that she acted with specific intent or willful blindness of the facts.  This claim has absolutely no merit.  Indeed, counsel's entire defense strategy was designed to show that Petitioner was a full-time mother of six children who worked at FBMC part-time and had only limited duties at FBMC.  Counsel made a motion for judgment of acquittal on these grounds at the close of the Government's evidence and again at the close of all evidence.  **Trial Transcript, Vol. V, at 1171-80.** Throughout her closing argument, Petitioner's counsel vigorously argued that the burden of proving the absence of good faith was on the Government; that Petitioner's job at FBMC was to fund loans; that Petitioner relied on others at FBMC with more mortgage loan experience; and that Petitioner did not know that what she was doing was illegal. **Transcript of Closing Arguments, at 48-50**.  Further, as for the specific intent, counsel argued to the jury, "[the government] also has to prove that [Mrs. McLean] was willful.  That refers to an act committed by an accused

person voluntarily with knowledge that it was prohibited by law and with the purpose of violating the law." *Id.* **at 51**.  It is clear from the record that trial counsel did, in fact, argue that the Petitioner acted in good faith and that the Government failed to prove that Petitioner's actions were wilful. Petitioner has simply failed to establish that counsel was deficient with respect to this claim.  Indeed, the Fourth Circuit specifically noted in its opinion denying Petitioner's direct appeal, "throughout the trial, [Petitioner] continually contested that she did not know or intentionally attempt to defraud Fannie Mae, Ginnie Mae, or BB&T; that she did not 'knowingly make false entries [or] false statements;' and that she did not 'knowingly launder money' or 'aid and abet [any] other in any criminal activity.'"
**McLean, 131 F. App'x at 39 (quoting Appellants' Brief at 29).**

As for her next claim, Petitioner contends her counsel was ineffective for failing to impeach Eric Brown's testimony concerning his dealings with co-defendants James McLean and Debbie Zimmerman.  Eric Brown testified on direct examination that he and his father met with Debbie and Paul Zimmerman and James McLean to discuss FBMC's financing for building a residential development of a track of land owned by their family.
**Trial Transcript, Vol. IV, at 861-63**.  When presented with completed

mortgage loan notes in the names of his family members by Debbie Zimmerman, Mr. Brown and his father refused to sign until they could show the documents to their attorney. *Id.* **at 868.** Debbie Zimmerman would not permit Eric Brown leave the premises with the completed loan agreements. *Id.* **at 870.** When James McLean arrived at the meeting, he also said the notes could not leave the office, followed by, "Look, this – this is legal, but it's not really legal." *Id.* **at 871.** Petitioner contends her counsel should have cross-examined Eric Brown about specific facts. However, Eric Brown did not testify that Macy McLean was present or even aware of the meeting about which he testified. Additionally, the Court notes that the other defense counsel, representing Petitioner's co-defendants, did cross-examine Eric Brown regarding his identification of their clients. *Id.* **at 875-88.** Since Eric Brown never even mentioned Petitioner, her counsel's decision not to cross-examine him cannot be considered deficient. Petitioner has not established either prong of the *Strickland* test and, therefore, her claim must fail.

In a related claim, Petitioner contends that her counsel was ineffective for failing to request "an evidence hearing" in order to have the testimony of Eric Brown and Woodrow Moore "suppressed." As noted

above, Eric Brown did not mention Petitioner in his testimony.  The record also reveals that Woodrow Moore likewise did not mention Petitioner in his testimony.  Instead the testimony of these witnesses concerned transactions that occurred during the alleged conspiracy and involved the same scheme to defraud.  Counsel's strategy in defending Petitioner was to put as much distance between Petitioner and the operations of FBMC as she could.  Since neither witness ever mentioned Petitioner in their testimony, it was not unreasonable for counsel not to object to their testimony.

Next, Petitioner contends that her counsel was ineffective for failing to raise prosecutorial misconduct at trial.  Petitioner contends that the prosecutor knew " a lot of the government witnesses testified falsely" and failed to correct them.  Petitioner contends the prosecutor suborned perjured testimony from James Harvery Beatty,[8] Sharon Abrams, Richiedean Gess, Sandra Dixon and Eric Brown.  She also alleges two

---

[8] Petitioner alleges that Beatty perjured himself before the grand jury when he testified that he made mortgage payments on an FBMC home loan when other FBMC employes told the FBI that Beatty had not made any payments on his loan.  Defense counsel was provided with a transcript in accordance with 18 U.S.C. § 3500.  Since the issue at trial was that the "loans" were bogus, whether or not Beatty made any payments was not material.

*Brady*[9] violations with respect to FBMC's HUD application and approval to issue Title I manufactured home loan guarantees and a business plan and loan request that FBMC submitted to BB&T. Finally, she argues that the prosecutors made certain misleading statements in response to her direct appeal to the Fourth Circuit.

In order to establish a claim of prosecutorial misconduct, a defendant must show that the alleged "conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process." ***United States v. Scheetz*, 293 F.3d 175, 185 (4th Cir. 2002)**. Additionally, there is a two-prong test for reversible prosecutorial misconduct. First the defendant must show that the prosecutor's remarks or conduct were improper. Second, the defendant must establish that such remarks or conduct prejudicially affected her substantial rights so to deprive her of a fair trial. *Id*. "A defendant seeking to vacate a conviction based on perjured testimony must show that the testimony was, indeed, perjured." ***United States v. Griley*, 814 F.2d 967, 971 (4th Cir. 1987).**

Here, as discussed throughout this Order, Petitioner has not established that any of the Government's witnesses provided false

_____

[9] ***Brady v. Maryland*, 373 U.S. 83 (1963).**

testimony. At most, she has shown minor inconsistencies between the witnesses' trial testimony and/or their prior statements to law enforcement. "Mere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony." *Id.* **(citing** ***Overton v. United States*, 450 F.2d 919, 920 (5th Cir. 1971)).** Petitioner has not established that any of these witnesses provided perjured testimony. Therefore, she has also not established that her counsel was ineffective for failing to raise this claim.

Petitioner also claims that her counsel was ineffective for failing to raise a *Brady* claim. Specifically, Petitioner contends that the prosecutor acted improperly by failing to "[b]ring forth" two documents at trial: (1) FBMC's "application and letter for Title I approval" and (2) a business plan and loan request that FBMC submitted to BB&T.

In order to establish a *Brady* claim, a defendant must show that: (1) the evidence must be favorable to the defendant, whether directly exculpatory or of impeachment value; (2) it must have been suppressed by the Government; and (3) it must be material. ***Spicer v. Roxbury Corr. Inst.,* 194 F.3d 547, 555 (4th Cir. 1999).**

Petitioner has not shown that the documents at issue ever existed. Although James McLean testified that FBMC did, at one time, have a copy of a Ginnie Mae application to pool manufactured home loans, Ginnie Mae executive, Sandra Dixon, testified that she had never seen it and there was no such document in FBMC's file at Ginnie Mae. **Trial Transcript, Vol. V at 1221, Vol. VI at 1642**. With respect to the business plan, James McLean testified that BB&T loan officer John Ellis knew that FBMC was funding "construction manufactured homes" with BB&T's warehouse line of credit. **Trial Transcript, Vol. V, at 1325-26.** However, John Ellis testified that BB&T rejected James McLean's proposal to have the bank fund closings for mobile homes or construction loans. **Trial Transcript, Vol. IV, at 904-05**. Neither stated that FBMC had submitted a formal written business plan. Despite James McLean's argument at trial, the Government afforded defense counsel open file discovery of thousands of pages of documents. **Trial Transcript, Vol. V, at 1249-50**.

Next, Petitioner has failed to allege that these documents were material to her defense. At trial, the Government established that the defendants created and sold loans for which there were no real borrowers and, except for a few, had no homes as collateral. **Trial Transcript, Vol.**

**IV, at 1073-81.**  However, whether or not the defendants believed they could sell manufactured homes or construction loans was not a defense to selling loans with no true borrower or collateral.  The loans that were pooled as Ginnie Mae securities and the loans that were funded with the BB&T warehouse line of credit did not qualify as FHA single family loans, Title I manufactured housing loans, or construction loans, because they were not, in fact, loans.  The notes sold by FBMC were instead worthless paper designed to conceal defendants' scheme to defraud.

Petitioner has not established a *Brady* violation, therefore, she has not established that her counsel was ineffective for failing to raise such a claim.

**F. Failure to Argue Petitioner was Legally Innocent in Light of *United States v. Santos*, 128 S. Ct. 2020 (2008)**

In a brief filed on October 11, 2008, Petitioner filed an amended claim in support of grounds 8, 17 and 23 in which she argues that her counsel was ineffective at trial and on appeal for failing to argue that she was legally innocent of the money laundering offenses based on the reasoning of *United States v. Santos,* 128 S. Ct. 2020 (2008).

In *Santos*, the Supreme Court considered the question of whether the term "proceeds" in 18 U.S.C. § 1956(a)(1), means "receipts" or "profits." The federal money laundering statute prohibits a number of activities involving criminal "proceeds" but does not define "proceeds," a term that could either mean "receipts" or "profits." *Id.* **at 2023-24.** In a 4-1-4 decision, the four justices joining the plurality opinion held that the term "proceeds" was ambiguous and, without legislative history adequate to clarify its meaning, the plurality Justices applied the rule of lenity and held that "proceeds" as used in § 1956(a)(1) means "profits," not total "receipts," from the criminal activity conducted. *Id.* **at 2025.** Accordingly, "a criminal who enters into a transaction paying the expenses of his illegal activity cannot possibly violated the money-laundering statute, because by definition profits consist of what remains after expenses are paid." *Id.* **at 2027.**

Justice Stevens concurred in the judgment, agreeing that with respect to the gambling enterprise at issue in *Santos*, Congress has not indicated its intent as to whether "proceeds" should be defined to include all "receipts" or just the "profits." *Id.* **at 2032-33 (Stevens, J., concurring).** However, Justice Stevens declined to join the plurality in its holding that

"proceeds" as used in § 1956 always means "profits" under the rule on lenity. *Id.* Instead, Justice Stevens explicitly recognized that the term "proceeds" could have a different meaning when referring to some specified unlawful activities as opposed to other activities and that "proceeds" should only be limited to "profits" under the rule of lenity where there exists no indication of legislative intent as to whether Congress intended the term to include the gross revenues of a particular unlawful activity or restricted to its profits. *Id.*

In the instant case, trial counsel was not ineffective for failing to argue that Petitioner was legally innocent of money laundering at trial or on appeal for several reasons. First, "there is no general duty on the part of defense [or appellate] counsel to anticipate changes in the law." ***Gov't of Virgin Islands v. Forte***, **865 F.2d 59, 62 (3d Cir. 1989);** ***see also*** ***Randolph v. Delo***, **952 F.2d 243, 246 (8th Cir. 1991) (ruling that trial counsel was not ineffective for failing to raise *Batson* challenge two days before *Batson* was decided); *Johnson v. Armontrout*, 923 F.2d 107, 108 (8th Cir. 1991) ("counsel's failure to anticipate a change in existing law is not ineffective assistance of counsel"); *Kornaherns v. Evatt*, 66 F.3d 1350, 1360 (4th Cir. 1995) ("an attorney's assistance is**

**not rendered ineffective because he failed to anticipate a new rule of law").** Next, Petitioner was involved in the type of specified unlawful activity addressed in *Santos* and because Justice Stevens made clear his agreement with the plurality was limited to that type of unlawful activity, an argument related to "proceeds" as limited to "profits" in the mortgage fraud context would have failed under *Santos*. *See United States v. Howard*, **309 F. App'x 760, 771 (4th Cir. 2009) (recognizing that *Santos* was limited to the unlawful activity of gambling enterprises).** Lastly, even if *Santos* did apply to mortgage fraud schemes, the Government produced ample evidence of both receipts generated from the scheme that were used to promote further unlawful activity and profits used for the personal expenses of Petitioner, her family, and friends. *See e.g.* **Government Trial Exhibits 50(a), 51(a)-(e), 65 (a)-(j); 62(a)-(b), 71.** Therefore, Petitioner was properly convicted of money laundering and she has not established deficiency nor prejudice in connection with her ineffective assistance of counsel claim.

## G. Claims of ineffective Assistance of Counsel on Appeal

Lastly, Petitioner contends that her counsel was ineffective on appeal because she failed to "state" that the evidence was insufficient to support her convictions and to prove she acted with "specific intent" and "willful blindness." Petitioner also claims that her counsel was ineffective for failing to argue on appeal that the Government misstated certain facts in its brief to the Court.[10]

Petitioner's claim that counsel failed to raise sufficiency of the evidence on appeal is without merit. Indeed, the Fourth Circuit held: "Having reviewed the record of evidence in the light most favorable to the government, we conclude there was ample evidence for a reasonable trier of fact to have found defendants guilty beyond a reasonable doubt on each count of conviction." *McLean*, **131 F. App'x at 41**. With respect to willful

---

[10] Petitioner also alleges her counsel was ineffective for failing to raise constructive amendment, defective amendment, multiplicity, duplicity and prosecutorial misconduct on appeal. As addressed *infra*, Petitioner's claims are without merit. Therefore, raising these issues on appeal would have been frivolous. Moreover, counsel is permitted wide latitude in determining which claims are most likely to succeed on appeal and are, therefore, worth bringing. *See Jones v. Barnes*, **463 U.S. 745, 751-52 (1983).** Petitioner's counsel was a zealous advocate at all stages, including on appeal, and the record establishes that she raised what she deemed to be the most meritorious issues on appeal. *See McLean*, **131 F. App'x at 38**.

blindness, the Court found "there was evidence from which a jury could have inferred that Macy McLean and the Zimmermans were aware or closed their eyes to the fact that mortgage notes contained false information; that no houses were being sold in connection with these loans; and that "investors" were receiving money for signing and that they were not going to be obligated under the note.  This evidence would support an inference of deliberate ignorance."  *Id.* **at 39-40.**

Once an issue has been fully considered by an appellate court, the defendant cannot re-litigate the issue before this Court under § 2255.  ***See Boechenhaupt v. United States*, 537 F.2d 1182, 1183 (4ᵗʰ Cir. 1976).** Petitioner's sufficiency of the evidence claim was raised on appeal, therefore, she is foreclosed from re-litigating it in this Court.

With respect to Petitioner's claim that the her counsel failed to draw the appellate court's attention to improper Government statements in its brief, Petitioner references the Government's reference in its appellate brief that "Macy McLean concedes that her husband avoided auditors, mislead others . . . "  The Petitioner argues that this statement was made by Petitioner's counsel without her consent.  Next, Petitioner complains that the Government improperly argued that (a) appellants had "built only a

dozen homes and sold none," whereas she asserts that they had built about 30 homes and sold at least five and (b) that Eric Brown testified that "[James] McLean explicitly stated that his investor program was not really legal," whereas Eric Brown's full testimony showed that James McLean's statement was "very ambiguous." A review of these statements shows that none of the statements were improper as they were supported by the record and were fair comments on the evidence at trial. Therefore, Petitioner has not established that her counsel was ineffective for failing to raise these issues on appeal.

## IV. CONCLUSION

Petitioner has presented a laundry list of alleged errors at trial and on appeal which she alleges constituted ineffective assistance of counsel. The Court's review of the record demonstrates that counsel was both zealous and competent at all stages of Petitioner's case. To the extent Petitioner's counsel was in any way deficient, Petitioner has not established the prejudice required by *Strickland*. Consequently, all of Petitioner's ineffective assistance of counsel claims must fail.

## V.  ORDER

**IT IS, THEREFORE, ORDERED** that the Government's motion for summary judgment is **GRANTED**, and Petitioner's motion to vacate, set aside or correct sentence pursuant 28 U.S.C. § 2255 is **DENIED.**

A Judgment dismissing this action is filed herewith.

Signed: August 27, 2009

Lacy H. Thornburg
United States District Judge